**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANTHONY T. ROBINSON, SR., et al.,** | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 22-655-KSM** |
| **POTTSTOWN AREA RAPID TRANSIT, INC., et al.,** | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                    **September 16, 2022**

Plaintiffs Anthony Robinson, Valerie Robinson, and Darris L. Tinson bring this action against Defendants Pottstown Area Rapid Transit ("PART"), C.M.D. Services, Inc. ("CMD"), and D & D Collision Services, Inc. ("D&D") (collectively, "Defendants") for violations of the Fair Labor Standards Act ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA"). Plaintiffs assert claims based on Defendants' failure to pay overtime in violation of the FLSA and PMWA on behalf of themselves and other similarly situated individuals (Counts I and II). Additionally, Mr. and Mrs. Robinson each assert individual retaliation claims (Counts III and V), and Mr. Robinson also brings an individual claim based on Defendants' failure to pay him overtime for hours worked as a Driving Supervisor (Count IV). Defendants have filed a partial motion to dismiss (Doc. No. 13), which Plaintiffs oppose (Doc. No. 14). For the reasons that follow, the Court denies in part and grants in part the motion.

**I.      Background**

Accepting all allegations in the Second Amended Complaint as true, the relevant facts are as follows.

### A.  The Defendants

PART is a private corporation that employs bus drivers for Pottstown's public transit entity (also known as PART), and CMD "owns a substantial fleet of busses [sic]" and employs school bus drivers.  (Doc. No. 15 at ¶¶ 1, 11, 16–17, 21.)  CMD pays its drivers less than PART.  (*See id.* at ¶ 42 (stating that drivers received "substantially less" pay for CMD shifts compared to PART shifts).)  Drivers who worked for PART regularly drove for CMD as well.  (*See, e.g.*, *id.* at ¶¶ 19, 41.)  PART drivers were often instructed to end their PART shifts early so that they could drive CMD buses. (*Id.* at ¶ 42.)  When a driver's PART shift ended early, he was still paid for the remainder of his PART shift.  (*Id.*)  A driver could not earn overtime, however, because he would be clocked in for CMD and out of PART.  (*Id.*)

D&D, on the other hand, "did not operate any transit or other trucking operation."  (*Id.* at ¶ 36.)  D&D is a "large mechanic's enterprise with repair and body shops" and hires laborers to complete maintenance-related tasks.  (*See id.* at ¶¶ 1, 11, 16–17; *see also id.* at ¶ 35 ("Plaintiffs and other putative collective/class members were not drivers for D&D; they worked other jobs such as cleaning busses [sic]; gassing busses [sic]; taking vehicles to/from the shop for repair; and other jobs (for example, watering plants on Defendant's land and for Pottstown municipal properties").)  D&D pays less than PART.  (*See id.* at ¶ 45.)  As discussed in more detail below, Mr. Robinson alleges that he regularly needed to leave his PART shift early to work for D&D and was paid for the remainder of his PART shift as well as for D&D.[1]

PART, CMD, and D&D operate out of the same office address (902 Farmington Avenue,

---

[1] It also appears that Plaintiffs are alleging that even when drivers were not specifically instructed to end their shifts early, drivers who needed to get started on their duties with the other companies (CMD or D&D) routinely ended their PART shifts early to do so and were still paid their entire PART shift up until December 2021 when a new individual took over payroll.

Pottstown, Pennsylvania) and are owned and operated by the same individuals.  (*Id.* at ¶¶ 7–9, 22–29.)  For example, Charles Dickerson is the President of PART, CMD, and D&D, and Operations Manager Jennifer Ridgeway manages all three entities.  (*Id.* at ¶¶ 24–25.)  In addition, Brian Clayton assigns drivers to drive for PART and for CMD school buses; he also coordinates the schedules, along with Ms. Ridgeway.  (*Id.* at ¶¶ 26–27.)  The same individual (Mary Oxenford prior to her retirement, followed by either Ms. Ridgeway or Denise Iku)[2] handles the payroll for all three companies.  (*Id.* at ¶ 28.)

### B.  Class Allegations

Plaintiffs allege that PART, CMD, and D&D were a single or joint employer and that Defendants violated the FLSA and PMWA by failing to pay overtime to individuals who worked more than 40 hours a week, combined across all three entities.  (*See id.* at ¶¶ 66, 75–76, 82–83.) According to Plaintiffs, "Defendants' conduct was knowing, willful, reckless and/or objectively unreasonable."  (*Id.* at ¶¶ 78, 85.)

Specifically, Plaintiffs allege that full-time drivers regularly performed 40 hours of work for PART.  (*Id.* at ¶ 19.)  Although the drivers were paid overtime for their work when they drove more than 40 hours for PART, many also drove for CMD, and Plaintiffs claim that they were not paid overtime when they worked over 40 hours for the two entities *combined* (i.e., they were not paid overtime when their combined time worked for PART *and* CMD exceeded 40 hours).  (*Id.*)  Plaintiffs also allege that *part-time* drivers regularly drove more than 40 hours combined between PART and CMD and were not paid overtime for their combined shifts.  (*Id.* at ¶ 20.)

---

[2] It is unclear who ran payroll after Ms. Oxenford's retirement, as this allegation states it was either Ms. Ridgeway or Ms. Iku but elsewhere Mr. Robinson alleges that after he was shorted his pay, he spoke to Ms. Ridgeway.

### C.  Mr. Robinson's Work for Defendants and Eventual Termination

####     1.  Mr. Robinson's Work for PART and CMD

From 1987 until his termination in January 2022, Mr. Robinson worked as a transit bus driver for PART and a school bus driver for CMD.  (*Id.* at ¶ 16.)  PART paid Mr. Robinson approximately $25 an hour.  (*Id.* at ¶ 45.)

From 2017 or 2018 until January 2022, Mr. Robinson also served as a Driving Supervisor.  (*Id.* at ¶ 43.)  "He was paid for an additional 'salary' equal to four hours' pay for this work."  (*Id.*)  However, this "pay did not count as hours worked" and could not be contributed towards his overtime status.  (*Id.*)  As a Driving Supervisor, Mr. Robinson was responsible for preparing the weekly schedule and finding drivers to fill in when other drivers were sick, the latter of which often required him to field calls on his days off or while he was on driving duty for PART.[3]  (*Id.* at ¶¶ 43–44.)  Part-time and full-time PART drivers were regularly unavailable to fill in when needed.  (*See id.* at ¶¶ 46–47.)  Oftentimes, when a part-time driver "was needed for PART, the driver was already out on a CMD run and not available to fill in the PART shift," which ultimately cost the driver $5 an hour because CMD paid less than PART. (*Id.* at ¶ 46.)  And full-time drivers often could not be called to cover PART shifts on their days off (and therefore earn overtime) because Mr. Clayton already scheduled them to drive for CMD. (*Id.*)

---

[3] Mr. Robinson's supervisors—Mr. Clayton, Ms. Oxenford, and Ms. Ridgeway—would call him to discuss scheduling matters.  (*Id.* at ¶ 44.)

### 2. **Mr. Robinson Raises Scheduling Issues to Defendants' President, Mr. Dickerson**

A few weeks before his termination, Mr. Robinson went to Mr. Dickerson's office "to discuss the unavailability of PART drivers to fill in when needed." (*Id.* at ¶ 47.) Mr. Robinson stated that "PART drivers were rarely available to cover PART runs because they were all assigned [to] CMD" and "PART drivers were making less money for CMD." (*Id.*) Mr. Robinson explained that drivers "would all want to drive for PART, either for the higher salary or for overtime," and he warned that "this may cause trouble." (*Id.*) Mr. Dickerson advised that he would discuss the matter with Ms. Ridgeway. (*Id.*) Mr. Robinson also told Mr. Dickerson that "he was on their side," and Mr. Dickerson responded that "[Mr. Robinson] might have learned from their previous interactions." (*Id.*) Mr. Robinson "understood this to mean 'don't mess with me.'" (*Id.*)

### 3. **Mr. Robinson's Work for D&D**

In 2019, D&D hired Mr. Robinson as a laborer and paid him approximately $17 per hour. (*Id.* at ¶ 45.) Mr. Robinson's duties included preparing PART buses for their runs. (*Id.*) To prepare buses for their evening runs, Mr. Robinson needed to start approximately 1.5 hours before the runs; however, his own PART shift ran until 6:00 p.m. or 6:30 p.m. (*See id.*) Mr. Robinson decided to do this work (i.e., preparing the buses for their runs for D&D) because Defendants had a practice of paying PART drivers the rest of their PART shift while he or she was working for another Defendant. (*Id.*) In other words, Mr. Robinson would earn his D&D pay plus the pay for his full PART shift, even if he had to leave his PART shift early to prepare for the runs.

### 4. **Mr. Robinson Is Shorted Pay and Complains**

At the end of December 2021, Ms. Oxenford retired, and Ms. Ridgeway took over her

responsibilities.  (*Id.* at ¶ 48.)  The first paycheck Defendants issued to Mr. Robinson following Ms. Oxenford's retirement did not include payment for his full PART run (i.e., the run that he left early so he could complete his D&D work).  (*Id.* at ¶¶ 49–50.)  Upon discovering "the shorted pay," Mr. Robinson complained to Ms. Ridgeway.  (*Id.* at ¶ 50.)  Ms. Ridgeway told Mr. Robinson that he "could not be paid for the full shift for PART because he was not driving for PART but was doing work for D&D instead."  (*Id.*)  Mr. Robinson responded that "he always got paid for the remainder of his regularly scheduled PART shift while he worked for D&D."  (*Id.*)  Nonetheless, Ms. Ridgeway maintained that Mr. Robinson "could not be paid for the remainder of his PART shift."  (*Id.*)  Mr. Robinson ended the call because he was "distraught that he worked for less than half of what he expected to be paid," given that he only earned his D&D pay instead of his D&D pay plus the pay he would have received for the remainder of his PART shift.  (*Id.*)

Shortly after ending the call, Mr. Robinson remembered that he was scheduled to end his PART shift early that same day to work for D&D, so he called Ms. Ridgeway back.  (*Id.* at ¶ 51.) Mr. Robinson "asked whether he would be paid for his full PART run if he left for D&D, in addition to his D&D pay" since he was scheduled to end his PART shift early to go to D&D, and Ms. Ridgeway responded that he would be.  (*Id.*)  Mr. Robinson asked why her answer was different this time (i.e., for this shift, where he was scheduled to leave early as opposed to the shift worked for the last pay period when he chose to leave early to start his duties with D&D ).[4] (*Id.*)

Following this conversation with Ms. Ridgeway, Mr. Robinson felt "too distraught to keep" driving, so he called Mr. Clayton and "asked to be relieved from his run."  (*Id.* at ¶ 52.)

---

[4] The Second Amended Complaint does not allege Ms. Ridgeway's response to this question.

Mr. Clayton told him to meet a new driver at the transportation center.  (*Id.*)  Later that day,

Mr. Robinson received a text message from Ms. Ridgeway instructing him not to return to work.

(*Id.* at ¶ 53.)  Thereafter, he learned he was suspended and was instructed to appear in the office

for a meeting.  (*Id.*)

### 5.   Mr. Robinson Is Terminated

During that meeting, which occurred on January 24, 2022, PART terminated

Mr. Robinson's employment.  (*See id.* at 17–18; *see also id.* at ¶ 54.)  "It was known to

[Mr. Robinson] and to Defendants that his termination from PART meant that he was also

terminated from employment from CMD and D&D."  (*Id.* at ¶ 32.)  The termination letter

Mr. Robinson received listed three reasons for his termination, including multiple violations of

federal, state and company safety laws, overstatement of hours worked, and insubordination.  (*Id.*

at 17.)  Specifically, the letter stated:

> The reasons for your termination are as follows:
>
> 1.    Multiple violations of federal, state and company safety laws.  This
> includes failure to stop at a railroad crossing with passengers onboard;
> talking on [the] phone while driving; failure to wear the seatbelt while
> driving; no face mask while driving; drinking while driving with passengers
> on the bus, and other violations.
>
> These actions endangered the riding public and are clear violations of
> federal and state laws as well as company policy.  Our contract with the
> Borough of Pottstown requires strict compliance with all laws, especially
> safety requirements.  We have video confirmation of these violations.
>
> 2.    Overstatement of hours worked.  This allegation is documented and
> shows that you did not work the number of hours billed to the company.
> This was fraudulent and dishonest behavior and is expressly prohibited by
> the company's policies.
>
> 3.    Insubordination.  In multiple discussions with management, you
> acted in a disrespectful and insubordinate manner.  Also, we have video
> evidence of you yelling at passengers on the bus, which is another violation.

(*Id.*)

Mr. Robinson alleges that these enumerated reasons are pretextual.  (*See id.* at ¶ 55.)

In addition, Mr. Robinson claims that Defendants threatened to bring a counterclaim against him for receiving pay for PART while working for D&D," which he asserts was "another retaliatory act" as receiving D&D pay plus the pay for the remainder of his PART shift "was what was promised to [him]."  (*Id.* at ¶ 56.)

### D.  Mrs. Robinson

Like Mr. Robinson, Mrs. Robinson was also at one point employed by all three entities. Unlike Mr. Robinson, however, she remains employed by PART and CMD.  Specifically, in 2002, Mrs. Robinson began working as a school bus driver for CMD, and a few years later, in 2006, she was hired as a part-time paratransit driver for PART.  (*Id.* at ¶ 17.)  Mrs. Robinson continues to work in these roles.  (*Id.*)  Mrs. Robinson worked as a laborer for D&D from 2019 until January 2022.  (*Id.*)

As noted, Mrs. Robinson still works for PART.  (*Id.* at ¶ 58.)  Although Mrs. Robinson often "reports for work without interacting with supervisors," at times, she "is forced to see" Mr. Dickerson.  (*Id.* at ¶ 59.)  Mrs. Robinson alleges that, ever since this lawsuit has been filed, each time she has had to interact with Mr. Dickerson, he has treated her "in a hostile and demeaning manner."  (*Id.* at ¶ 60.)  The first time, Mr. Dickerson "stated words to the effect of 'why are you still here?'"  (*Id.* at ¶ 61.)  Although Mr. Dickerson said that he believed that Mrs. Robinson did not want to get involved in her husband's termination, he also "said words to the effect of, but now you're stuck dealing with it and I don't lose."  (*Id.*)  On another occasion, Mr. Dickerson told Mrs. Robinson that she had "a big head" and touched her "head with a measuring device."  (*Id.* at ¶ 62.)  In addition, every time they meet, Mr. Dickerson now "stare[s]" at Mrs. Robinson "in a hostile manner."  (*Id.* at ¶ 63.)  Mrs. Robinson alleges that she now "feels anxiety and stress every time she goes to the office to get or return keys" because she

is scared that she will run into Mr. Dickerson.  (*Id.*)

## II.     Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the non-moving party's complaint.[5]  *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).  However, the Court need not "accept . . . a legal conclusion couched as a factual allegation."  *Id.* (quotation marks omitted).  To state a claim for relief, the plaintiff must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## III.    Discussion

First, Defendants argue that Plaintiffs' allegations that Defendants willfully violated the FLSA and PMWA[6] are conclusory and, therefore, allegations of willfulness should be dismissed. (*See* Doc. No. 13 at 14 ("The Court should dismiss Plaintiffs' allegation that any violations were 'knowing, willful, reckless and/or objectively unreasonable' because they failed to plead any

---

[5] The Court must accept at true the facts alleged in the Second Amended Complaint; however, at times it is difficult to understand the allegations as pled.  For example, the Court is uncertain why a distinction is drawn at times between PART "part-time" drivers and "full-time" drivers.

[6] We address the FLSA and PMWA claims together.  *See, e.g.*, *Baum v. Astrazeneca LP*, 372 F. App'x 246, 248 n.4 (3d Cir. 2010) ("Pennsylvania courts have looked to federal law regarding the [FLSA] for guidance in applying the PMWA.  According to the Pennsylvania courts, it is proper to give deference to federal interpretation of a federal statute when the state statute substantially parallels it." (cleaned up)).

facts to support the allegation."); *see also id.* at 12 ("The Second Amended Complaint's conclusory claim that any alleged violations were 'knowing, willful, reckless, and/or objectively unreasonable' must be dismissed because it is unsupported by any factual allegations sufficient to show that the claim is plausible.").)  Second, Defendants contend that Mr. Robinson has failed to state a retaliation claim because he did not engage in protected activity; they also argue that Defendants' contemplation of counterclaims against Mr. Robinson does not constitute an adverse employment action because Plaintiffs have failed to plead that the potential counterclaims were baseless.  (*Id.* at 14–16.)  Third, Defendants argue that Mrs. Robinson's retaliation claim must be dismissed because she has failed to plead that she suffered an adverse employment action.  (*Id.* at 16–19.)  We address each argument in turn.

### A.  *Plaintiffs' Allegations of "Willfulness"*

First, we address Defendants' argument that allegations of willfulness should be dismissed.  (Doc. No. 13 at 12–14.)

The Court finds Plaintiffs have pleaded sufficient factual allegations of willfulness. "[W]illfulness under the FLSA is established where 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA].'"  *Stone v. Troy Constr., LLC*, 935 F.3d 141, 150 (3d Cir. 2019) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  Although a "showing of egregiousness" is not required to show willfulness, *see id.*, a plaintiff must plead more than mere negligence.  *See Lincoln*, 2022 WL 2356775, at *3 ("Willfulness means more than negligent."); *see also Smeltzer v. Eaton Corp.*, Civil Action No. 17-843, 2018 WL 3496948, at *2 (W.D. Pa. July 20, 2018) ("Willfulness . . . 'requires a deliberate effort more than mere negligence.'" (quoting *Brock v. Richland Shoe Co.*, 799 F.2d 80, 82 (3d Cir. 1986))).  "An employer's awareness of possible violations of the FLSA,

together with an indifference towards the requirements imposed by the statute supports a finding of willfulness." *Garcia v. Tenafly Gourmet Farms, Inc.*, Civil Action No. 11-6828 (SRC), 2012 WL 715316, at *2 (D.N.J. Mar. 5, 2012) (cleaned up).

Here, Plaintiffs plead that "Defendants' conduct was knowing, willful, reckless and/or objectively unreasonable," which is conclusory. (*Id.* at ¶¶ 78, 85.)  However, the Court finds that elsewhere Plaintiffs have pleaded sufficient facts to support the reasonable inference that Defendants knew they were violating the FLSA or recklessly disregarded the statute.  For example, Plaintiffs allege that Mr. Clayton scheduled PART drivers to drive CMD shifts on their days off from PART, and that Mr. Robinson complained to Mr. Dickerson about how there were not enough drivers to fill in for PART because Mr. Clayton had scheduled them to drive for CMD on their days off.  Mr. Robinson warned Mr. Dickerson that this could cause trouble because the drivers would rather drive for PART for higher pay and/or overtime, and Mr. Robinson explained that he was on "their side."  Mr. Dickerson responded "that [Mr. Robinson] might have learned from their previous interactions," which Mr. Robinson understood to mean Mr. Dickerson was warning him not to mess with him.

In addition, Plaintiffs plead that when Mr. Robinson discovered he had not been paid for his full shift for PART because he had left early and gone to work for D&D, as Mr. Robinson had routinely done since working for PART and D&D since 2019, Ms. Ridgeway told him he was not entitled to recover his full PART pay because he had left early.  Mr. Robinson hung up and then realized that he was actually "scheduled" that day to leave his PART shift early and go work for D&D.  He called Ms. Ridgeway back and questioned if he would be paid for his full PART shift given that he was "scheduled" to leave early.  Ms. Ridgeway confirmed he would be paid because he was "scheduled" to leave early to go work at D&D.  Mr. Robinson questioned

how this was "different" from what had happened in the previous pay period.  Taking all these facts as true as we must at this stage, such an inconsistent practice under which employees were sometimes "scheduled" employees to leave early from PART to go work at D&D and still be paid for their PART shift, plausibly suggests Defendants knew they were engaging in wrongdoing.  Therefore, the Court finds that Plaintiffs have alleged that Defendants were aware of possible FLSA violations.  *Contra Lincoln v. Apex Human Servs. LLC*, Civil Action No. 22-341, 2022 WL 2356775, at *3 (E.D. Pa. June 29, 2022) ("Plaintiff fails to plead facts to support her claim that defendants' alleged violations of the FLSA were willful.  She merely avers that defendants were fully aware of state and federal law but failed to classify her and others properly as employees, instead classifying all of them as independent contractors.  Plaintiff makes conclusory statements that defendants willfully violated the FLSA.  That is not enough to make plausible the claim that defendants knew or recklessly disregarded that their actions violated the FLSA.").

For these reasons, the Court denies Defendants' motion to dismiss the allegations that Defendants acted willfully.

### B.  Mr. Robinson's Retaliation Claim

Next, the Court turns to Mr. Robinson's FLSA retaliation claim, in which he alleges that Defendants retaliated against him because he complained about his shorted pay.  (*See* Doc. No. 15 at ¶¶ 88–89.)

A plaintiff bringing an employment retaliation claim must plead that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal connection existed between the protected activity and the adverse action.  *Feliciano v. Coca-Cola Refreshments USA, Inc.*, 281 F. Supp. 3d 585, 592 (E.D. Pa. 2017).  Here, Defendants argue that

Mr. Robinson did not engage in a protected activity and that the threatened counterclaim did not constitute an adverse action.

* * *

Plaintiffs argue that Mr. Robinson engaged in protected activity twice: first, when he "pointed out that drivers objected to losing higher salary and overtime driving for PART instead of earning less, with no overtime, driving for CMD" and second, when he objected to his pay being shorted. (Doc. No. 14 at 11–12.)

The FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). "To fall within the scope of the [FLSA] antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection. This standard can be met, however, by oral complaints, as well as by written ones." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). Informal and internal complaints constitute protected activity under the FLSA. *See Szewczyk v. United Parcel Serv., Inc.,* Civil Action No. 19-1109, 2019 WL 5423036, at *6 (E.D. Pa. Oct. 22, 2019) ("A formal written complaint is not required; rather, an informal oral complaint made by an employee to a supervisor constitutes protected activity within the meaning of the statute."); *Jones v. Amerihealth Caritas*, 95 F. Supp. 3d 807, 814 (E.D. Pa. 2015) (holding that the plaintiff had adequately pleaded he engaged in protected activity where he "specifically allege[d] he made internal complaints to Amerihealth's Human Resources employee Michael Greevy in Summer 2012, regarding the alleged pay disparity.").

We first address Plaintiffs' contention that Mr. Robinson engaged in protected activity during his conversation with Mr. Dickerson.  Plaintiffs pleaded that Mr. Robinson went to Mr. Dickerson's office "to discuss the unavailability of PART drivers to fill in when needed."  Mr. Robinson stated that "PART drivers were rarely available to cover PART runs because they were all assigned [to] CMD" and "PART drivers were making less money for CMD."  Mr. Robinson explained that drivers "would all want to drive for PART, either for the higher salary or for overtime," and he warned that "this may cause trouble."  Mr. Dickerson advised that he would discuss the matter with Ms. Ridgeway.  Mr. Robinson also told Mr. Dickerson that "he was on their side," and Mr. Dickerson responded that "[Mr. Robinson] might have learned from their previous interactions."  Mr. Robinson "understood this to mean 'don't mess with me.'"

Even taking these facts as true, the Court cannot find that these allegations plausibly suggest that Mr. Robinson's conversation with Mr. Dickerson "was an assertion of rights protected by the [FLSA] and a call to their protection."  As pleaded, at most, Mr. Robinson raised concerns about the "unavailability of PART drivers to fill in as needed" and that PART drivers who were unable to fill in because they were scheduled to drive for CMD, making less, "may cause trouble."  This is not sufficiently clear to put Defendants on notice that Mr. Robinson believed he and other PART drivers needed to be paid overtime or were otherwise asserting their rights under the FLSA.  *Cf. Rovetto v. Dublirer*, Civil Action No. 20-cv-2497 (JMV) (MF), 2020 WL 7022667, at *6 (D.N.J. Nov. 30, 2020) ("Plaintiffs allege that they asked Dublirer to clarify the company policy about administrative rent compensation and that Dublirer told them they would not receive money.  This allegation is insufficient to plausibly allege that Plaintiffs engaged in protected activity under FLSA—asking to clarify a company policy, standing alone, does not put a reasonable employer on notice that Plaintiffs seek to assert their rights under

FLSA."). *Contra Sondesky v. Cherry Scaffolding, Inc.*, 2017 WL 3873578, at *3 (E.D. Pa. Sept. 5, 2017) ("Based on the facts alleged in the Amended Complaint, Sondesky's telephone conversation with Ellis plausibly satisfies the standard set by the Supreme Court in Kasten. Sondesky asserts that she told Ellis that she would need to be paid for all hours worked, including overtime.  Sondesky's right to overtime compensation is a right protected by the FLSA, and her demand to be paid overtime compensation actually due is a clear assertion of that right.").

As to Mr. Robinson's complaint about being shorted pay for his full PART run, Plaintiffs plead the following:  Upon discovering "the shorted pay," Mr. Robinson complained to Ms. Ridgeway.  Ms. Ridgeway told Mr. Robinson that he "could not be paid for the full shift for PART because he was not driving for PART but was doing work for D&D instead."  Mr. Robinson responded that "he always got paid for the remainder of his regularly scheduled PART shift while he worked for D&D."  Ms. Ridgeway continued to maintain that Mr. Robinson "could not be paid for the remainder of his PART shift."  Absent from the Amended Complaint, however, are any allegations that Mr. Robinson complained that he was denied overtime or was not paid minimum wage for hours he worked—i.e., an assertion of rights protected by the FLSA. *See Davis v. Abington Mem. Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) ("The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees." (cleaned up)); *see also Szewczyk,* 2029 WL 5423036, at *7 ("Where, as here, the Complaint alleges only that Szewczyk complained to his manager that he was not paid for all hours worked and does not allege that he did not receive overtime due or that he was not paid minimum wage, no reasonable, objective person could have understood him to be asserting rights under the FLSA.  We therefore conclude that the Complaint does not plausibly allege protected activity.").  Taking the facts as true most

and drawing all inferences in Plaintiffs' favor, Plaintiffs have not pleaded facts showing that a reasonable employer would construe Mr. Robinson's complaint to Ms. Ridgeway about his shorted pay as an assertion of his FLSA rights.[7]

For these reasons, Defendants' motion to dismiss Mr. Robinson's retaliation claim is granted.[8]

### C.  Mrs. Robinson's Retaliation Claim

Last, the Court turns to Defendants' argument that Mrs. Robinson's retaliation claim must be dismissed because Plaintiffs failed to allege that she suffered an adverse action.

As noted above, to plead a prima facie case of retaliation, a plaintiff must allege that he or she suffered a materially adverse employment action.  And under *Burlington Northern*, a plaintiff bringing a retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  548 U.S. at 68.  However, the antiretaliation provision does not protect an individual from *all* retaliation; rather, it only protects individuals "from retaliation that produces an injury or harm."  *Id.* at 67.

---

[7] In their opposition brief, aside from relying on *Kasten* to state the standard, Plaintiffs fail to cite a single case to support their position that Mr. Robinson's conduct amounted to protected activity.

[8] Because we find that Plaintiffs have not pleaded that Mr. Robinson engaged in protected activity, we need not address Defendants' argument that their contemplated counterclaim against Mr. Robinson did not constitute an adverse action given that Plaintiffs' failure to plead that the counterclaim was objectively baseless.  (*See* Doc. No. 13-1 at 15–16.)  Nonetheless, the Court notes that Plaintiffs failed to address this argument in their response.  (*See* Doc. No. 14 at 11–12.)  Accordingly, Plaintiffs have waived the issue.  *See, e.g.*, *Pa. Nat'l Mut. Cas. Ins. Co. v. Tidewater Equip. Co.*, Civil No. 3:21-CV-00551, 2022 WL 896876, at *5 (M.D. Pa. Mar. 9, 2022), *report and recommendation adopted*, 2022 WL 891428 (M.D. Pa. Mar. 5, 2022) ("As the failure to brief an opposition to portions of a motion to dismiss can result in a presumed waiver of that claim, we find that the plaintiff has conceded this argument by failing to respond to it in its reply brief."); *Jacobs v. Mayorkas*, Civil Action No. 21-0165, 2021 WL 1979436, at *1 (E.D. Pa. May 18, 2021) ("As for the Acting Chief of Staff position, Plaintiff waives this claim by failing to respond to Defendant's arguments that it is untimely and unexhausted.").

The Supreme Court emphasized that it "speak[s] of *material* adversity" because "it is important to separate significant from trivial harms." *Id.* at 68; *see also id.* ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.").

Here, Plaintiffs allege that Mr. Dickerson asked Mrs. Robinson "[W]hy are you still here?"; stated that she is "stuck dealing with [the lawsuit]" and that he "[doesn't] lose"; told her she had a "big head" and touched her head; and stares at her "in a hostile manner." (*Id.* at ¶¶ 61–63.) These are not *material* adverse actions; at most, they are trivial harms or petty slights that would not dissuade a reasonable worker from filing an FLSA lawsuit. *See, e.g.*, *Ray v. Int'l Paper Co.*, C/A No. 7:15-5009-TMC, 2019 WL 5157379, at *4 (D.S.C. Oct. 15, 2019) ("Ray's allegations that McDowell stared at her and jammed her production line, without more, are not material adverse employment actions."); *Coughlin v. Cal. Dep't of Corrs. & Rehab.*, No. 2:08-cv-02722-GEB-JFM, 2010 WL 1689463, at *13 (E.D. Cal. Apr. 26, 2010) (holding that being labeled a "trouble-maker" and being "stared" at were insufficient to constitute adverse employment actions); *Davila v. Potter*, 550 F. Supp. 2d 234, 241 (D.P.R. 2007) ("Being stared at by his manager one day and being yelled at during a meeting, absent additional repercussions, do not amount to [an] adverse employment action."). *Contra Mackereth v. Kooma, Inc.*, Civil Action No. 14-04824, 2015 WL 2337273, at *12 (E.D. May 14, 2015) ("Plaintiffs allege that Young was forced to resign as a result of the schedule change. A reasonable employee would find this change, given the context in which it was made, materially adverse. Moreover, Plaintiffs allege that, based on their tenure, they usually held the position of closer. The effective elimination of this position—and the resulting decreased opportunity for tips—again raises the inference that a reasonable employee would have found the action materially adverse.").

Because Mrs. Robinson has not pleaded that she suffered a materially adverse action, the Court grants Defendants' motion to dismiss Mrs. Robinson's retaliation claim.[9]

## IV.   Conclusion

For the foregoing reasons, the Court denies in part and grants in part Defendants' motion to dismiss.

An appropriate Order follows.

---

[9] To counter Defendants' argument that Plaintiffs have not pleaded that Mrs. Robinson suffered a materially adverse action, Plaintiffs cite *Jones v. Amerihealth Caritas*, asserting that it shows "emotional distress claims are cognizable for FLSA retaliation claims.  (*See* Doc. No. 14 at 12 ("[T]he FLSA is remedial and humanitarian in purpose and it is not to be interpreted or applied in a narrow, grudging manner, we find that at this stage in the proceeding, Jones may pursue compensatory damages for emotional distress." (quoting *Jones*, 95 F. Supp. 3d at 819)).)  But the portion of the opinion that Plaintiffs cite has nothing to do with whether emotional distress constitutes a *materially adverse action*; indeed, the quote is drawn from Judge Kearney's analysis as to *damages*.  *See Jones*, 95 F. Supp. 3d at 819 (analyzing compensatory damages for FLSA claim).