IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY T. ROBINSON, SR., et al.,<br><br>　Plaintiffs,<br><br>　*v.*<br><br>POTTSTOWN AREA RAPID TRANSIT, INC., et al.,<br><br>　Defendants. | CIVIL ACTION<br><br>NO. 22-655-KSM |

MEMORANDUM

**MARSTON, J.**                                                                                                              December 22, 2022

      Plaintiffs Anthony Robinson, Valerie Robinson, and Darris L. Tinson bring this action against Defendants Pottstown Area Rapid Transit ("PART"), C.M.D. Services, Inc. ("CMD"), and D & D Collision Services, Inc. ("D&D") (collectively, "Defendants") for violations of the Fair Labor Standards Act ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA"). (Doc. No. 24.)  As relevant here, Plaintiffs assert claims based on Defendants' failure to pay overtime in violation of the FLSA on behalf of themselves and other similarly situated individuals.  (*Id.* (Count I).)  CMD has filed a motion for summary judgment, arguing that the motor carrier exemption to the FLSA applies and therefore, Plaintiffs cannot succeed on the FLSA overtime claim against it.  (Doc. No. 17.)  Plaintiffs oppose the motion.  (Doc. No. 20.)  For the reasons that follow, the Court denies CMD's motion for summary judgment.

**I.**      **Factual Background**

      *A.*  **CMD**

      CMD is a company that operates school buses and employed Plaintiffs as bus drivers. (Doc. No. 20-1 at ¶¶ 4–5.)  CMD provides daily school bus services to the Pottstown and

Pottsgrove school districts, both of which are located in Pennsylvania. (*Id.* at ¶ 6.) CMD also rents its buses to customers for charter trips. (*Id.* at ¶ 7; *see also* Doc. No. 17-2, Ex. 1 at 7:4–8 ("Q: What is CMD's business, generally? A: They do charter for bus trips. And they do school transportation.").) During the summer, CMD primarily runs charter services. (Doc. No. 17-2, Ex. 1 at 14:18–23.)

CMD maintains a record of its charter trips, which are called daily trip sheets; these, along with invoices, show that CMD conducted 80 out-of-state trips from February 21, 2019 through May 7, 2022.[1] (Doc. No. 20-1 at ¶¶ 10–11; Doc. No. 23-1 at ¶ 40.) CMD also maintained a list called "Trip Charges," which shows how many miles away certain "common" locations were. (*See* Doc. No. 17-17, Ex. 16; Doc. No. 17-2 Ex. 1 at 20:15–18 ("Q: Can you describe what this record is? A: That is the CMD services list of trip charges. So it's precalculated miles when giving a cost for a trip to some very common destinations."), 22:18–19).) The list includes out-of-state locations, such as Hereford, Maryland; Princeton, New Jersey; New York City; and Wilmington, Delaware. (*See* Doc. No. 17-17, Ex. 16.) Jennifer Hovey—the current Chief Operating Officer of PART and a consultant for CMD, as well as the former Director of Operations for CMD—testified that the list is a guide that CMD uses to create quotes. (*See* Doc. No. 17-15, Ex. 14 at ¶¶ 1–3; Doc. No. 17-2, Ex. 1 at 21:3–5, 21:12–19 ("And this is a guide to make giving the quote a little bit faster, rather than having to go on and MapQuest every time. These are common locations that people will charter buses to.").)

CMD is registered with the U.S. Department of Transportation ("DOT") Federal Motor Carrier Safety Administration ("FMCSA") as an interstate motor carrier operating under USDOT

---

[1] CMD's "Revenue from Out of State Trips" was than 1% of its total revenues in 2019, 2020, 2021, and 2022. (Doc. No. 23-1 at ¶ 43.)

No. 1595185.[2]  (Doc. No. 20-1 at ¶ 13; *see also id.* at ¶ 15 ("FMSCA's Safety and Fitness Electronic Records (SAFER) System shows that CMD is registered with FMSCA as an interstate carrier.").)  Hovey avers that CMD requires its drivers to track their daily driving time and mileage on daily tracking forms, which she states was done "to comply with the [FMSCA] regulation of maximum driving time for passenger-carrying vehicles."  (Doc. No. 17-15, Ex. 14 at ¶¶ 6–7.)  According to Hovey, in the past, the FMSCA has come to CMD's office to inspect its Driver Qualification Files and driving time and mileage records.  (*Id.* at ¶ 8.)

In its most recent biennial update to the DOT/FMSCA, dated February 22, 2022, CMD represented that its drivers drove approximately 8,000 interstate miles during the 2021 calendar year.  (*Id.* at ¶ 14.)  However, Hovey testified that drivers do not need to be DOT-certified to drive for CMD; in other words, drivers need not be eligible to drive out of state to be employed by CMD.  (Doc. No. 17-2, Ex. 1 at 55:6–9 ("Q: So there are drivers who are employed by CMD that are not eligible to drive out of state?  A: Depending on whether or not they qualified for their physical, correct.").)  Approximately half of CMD's drivers are DOT-certified.  (*See id.* at 14:5–11, 55:2–11; *see also* Doc. No. 23-1 at ¶ 31 (admitting that CMD employs 50 drivers and only 20-30 drivers are DOT-certified for interstate travel).)

Hovey also testified about the process for selecting drivers for charter trips.  (*See* Doc. No. 17-2, Ex. 1 at 54:7–55:1.)  First, a driver must be qualified, meaning that the person has "to have the correct DOT physical in order to be able to drive the trip" and have the correct

---

[2] CMD's School Bus Driver Handbook references DOT regulations.  (*See* Doc. No. 17-3, Ex. 2 at 8 (including CMD's Drug and Alcohol Use and Testing Policy, which states, *inter alia*, "[DOT] has issued regulations which require the Company to conduct drug and alcohol testing of drivers.  The Company intends to comply freely with DOT drug and alcohol regulations as stated in this policy.  In addition, if the DOT regulations are amended, the Company will comply with the amended regulations automatically without resisting this policy"), 9 ("A driver who violates these prohibitions will be subject to disciplinary action mandated by the DOT.").)

3

licensure. (*Id.*) Second, a driver must choose to drive the particular charter trip, which is offered to each driver in order of seniority. (*Id.* ("Then there is the list of seniority. . . . So Brian would likely have asked the senior drivers for their availability, so – it's also based on choice. So they get – first they must be qualified and second they must choose to do it, based on seniority. If the most senior person doesn't want to do it, he goes to the next person on the list until someone is interested.").) In other words, driving charter trips is voluntary. (*See id.*; *see also* Doc. No. 23-1 at ¶ 30 (admitting "that drivers choose whether to be interstate drivers").)

### B. Plaintiffs

Each Plaintiff completed and signed a Pennsylvania Department of Transportation Self-Certification Form. (Doc. No. 20-1 at ¶ 18.) On the self-certification forms, when asked to choose the "driving types" that apply to them, Anthony Robinson and Darris Tinson checked the box for "NI - Non-Excepted Interstate Transportation," which states "Interstate drivers who are subject to the Federal Physical Qualifications and Examination regulations. A Medical Examiner's Certificate must accompany this form." (Doc. No. 17-6, Ex. 5; Doc. No. 17-9, Ex. 8.) Valerie Robinson also checked the "NI – Non Excepted Transportation" box on her self-certification form, which states, "I drive a commercial vehicle both in and outside the boundaries of Pennsylvania, and I currently carry a Medical Examiner's Certificate (DOT PHYSICAL CARD)." (Doc. No. 17-12, Ex. 11.)

Mr. Robinson and Mr. Tinson were qualified to drive interstate charters. (Doc. No. 20-1 at ¶¶ 22–23.) Although they did not drive any out-of-state charters during the three-year period before this suit was filed (*see* Doc. No. 20-1 at ¶¶ 22–23; Doc. No. 23-1 at ¶¶ 34, 36), they had both previously driven interstate charters. (*See* Doc. No. 17-2, Ex. 1 at 75:3–12 ("Q: Do you recall had he driven any of state trips – Anthony Robinson, that is? A: . . . [H]e was the long-time driver of the trip that Pottsgrove School District took to New York City every year at

Christmas. So he took many trips, but that is one I remember."), 75:16–76:6 (Hovey's testimony that Tinson drove out of state, including taking the trip to New York City "a couple of times" with Mr. Robinson).) Mrs. Robinson also did not drive any out-of-state-charters during the three-year period before the suit was filed. (Doc. No. 20-1 at ¶ 24; Doc. No. 23-1 at ¶ 35.) She was qualified to drive interstate charters until June 2022. (Doc. No. 23-1 at ¶ 38; Doc. No. 23-2, Ex. 24 at ¶¶ 7, 11 (Brian Clayton's declaration as the CMD Driver Supervisor that "Valerie Robinson maintained a valid US DOT FMSCA physical card at all times until on or about June 8, 2022, when she allowed her physical card to expire").)

## II. Legal Standards

### A. *Summary Judgment*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, the Court must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury. *Anderson*, 477

U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

### B. FLSA Exemptions

Under the FLSA, employers must pay overtime to covered employees who work more than 40 hours per week. 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees . . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."); *see also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1138 (2018). However, the FLSA also exempts many categories of employees from this requirement. 29 U.S.C. § 213; *see also Encino*, 138 S. Ct. at 1138.

As is relevant to this case, "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to [Section 31502 of the Motor Carrier Act ('MCA')]" is exempted from the FLSA overtime requirement. 29 U.S.C. § 213(b)(1). This is known as the MCA exemption. *See Resch v. Krapf's Coaches, Inc.,* 785 F.3d 869, 872 (3d Cir. 2015) ("[T]he MCA exemption removes from the FLSA's overtime protections 'any employee with respect to whom the Secretary of

Transportation has power to establish qualifications and maximum hours of service pursuant to [Section 31502 of Title 49 of the MCA].'" (cleaned up)).

Section 31502 applies to "transportation" described in § 13501, *see* 49 U.S.C. § 13502(a)(1), and § 13501 in turn grants "the Secretary [of Transportation] and the Board [] jurisdiction . . . over transportation by motor carrier and procurement of that transportation, to the extent that passengers, property, or both are transported by motor carrier between a place in a State and a place in another State," *id.* § 13501(1)(A). Section 31502(b) states that the Secretary of Transportation may prescribe maximum hours of service of employees of a motor carrier. *Id.* § 13502(b). At base, "[t]hrough the MCA exemption, Congress has prohibited the overlapping of jurisdiction between the Department of Labor and the [DOT)] regarding maximum hours of service." *Resch*, 785 F.3d at 872 (cleaned up).

For the MCA exemption to apply, two requirements must be met: (1) the employer must be a carrier subject to the DOT's jurisdiction, and (2) the employee must belong to a class of employees "engag[ing] in activities of a character directly affecting the safety of operation of motor vehicles in the transportation of public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA].'" *Id.* (quoting 29 C.F.R. § 782.2(a)).

Although the Third Circuit has previously stated that "exemptions from the FLSA are construed narrowly against the employer, with the employer bearing the burden to prove plainly and unmistakably that its employees are exempt," *id.*(cleaned up)), the Supreme Court later ruled otherwise, *see Encino*, 138 S. Ct. at 1142. Specifically, the Court rejected "the principle that exemptions to the FLSA should be construed narrowly . . . as a useful guidepost for interpreting the FLSA." *Id.* The Court explained that since "the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give them anything other than a

7

fair (rather than a narrow) interpretation." *Id.* The Court reasoned: "The narrow-construction principle relies on the flawed premise that the FLSA pursues its remedial purpose at all costs. But the FLSA has over two dozen exemptions, including the one at issue here. Those exemptions are as much a part of the FLSA's purpose as the over-time pay requirement. We thus have no license to give the exemption anything but a fair reading." *Id.*; *see also Green v. Lazer Spot, Inc.*, Civil Action No. 1:20-CV-495, 2021 WL 6063590, at *4 (M.D. Pa. Dec. 22, 2021) ("Courts are no longer to construe FLSA exemptions narrowly against the employer; instead, we now simply give exemptions a 'fair reading.' A fair reading is 'neither narrow nor broad' and recognizes both that employee rights are not the only rights at issue in FLSA cases and that employees' interests 'are not always separate from [or] at odds with their employers' interests.'" (citations omitted)); *Depalmva v. Scotts Co.*, Civ. No. 13-7740 (KM) (JAD), 2019 WL 2417706, at *5 n.7 (D.N.J. June 10, 2019) ("The Third Circuit has long held that exemptions to the FLSA are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.' *Encinco*, however, clearly overturns that former narrow-construction approach. Thus, employers are no longer bound to prove that an exemption is 'plainly and unmistakably' within the statute." (cleaned up)).

### III. Discussion

CMD asserts that summary judgment is mandated because CMD is exempted from the FLSA overtime requirement because it is a motor carrier and thus any FLSA overtime claim asserted against CMD necessarily fails. In contending that the MCA exemption applies, CMD argues that CMD is subject to DOT's jurisdiction and that Plaintiffs were reasonably expected to drive interstate routes. And Defendants maintain that the *de minimis* exception does not render

the MCA exemption inapplicable in this case. Because the Court finds that there is a genuine issue of material fact as to whether Plaintiffs reasonably could have expected to drive interstate, we only address that argument.

* * *

As noted *supra* Section I.B., for the MCA exemption to apply, Plaintiffs must belong to a class of employees "engag[ing] in activities of a character directly affecting the safety of operation of motor vehicles in the transportation of public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA].'" *Resch*, 785 F.3d at 872 (quoting 29 C.F.R. § 782.2(a)). The "relevant inquiry" is "whether Plaintiffs reasonably could have expected to drive interstate." *Id.* at 874. Courts determine this "answer by looking at, among other things, whether the carrier (employer) does any interstate work, assigns drivers randomly to that driving, and maintains a company policy and activity of interstate driving." *Id.*

Here, it is undisputed that CMD does interstate work through its chartering side of the business. (*See, e.g.*, Doc. No. 23-1 at ¶ 40 (showing that CMD identified 45 out-of-state trips involving at least 80 buses from February 21, 2019 to May 7, 2022).)[3] It is also undisputed that CMD is registered with the DOT/FMSCA as an interstate motor carrier. (Doc. No. 20-1 at ¶ 13.) Critically, however, a reasonable juror could find from the evidence currently in the record that CMD did *not* randomly assign drivers to interstate routes. Specifically, the evidence shows that only about half of CMD drivers are even qualified to drive interstate. (Doc. No. 23-1 at ¶ 31.) Further, the drivers who are DOT-certified and therefore qualified to drive out of state, like Plaintiffs, have a "choice" as to whether they will do so. (*See* Doc. No. 23-1 at ¶ 30; Doc. No.

---

[3] This time period encompasses the COVID-19 Pandemic. According to Ms. Hovey, the number of charter trips CMD did "in state and out of state" were "drastically impacted" by the pandemic. (Doc. No. 17-2 at 87:3–8.)

9

17-2, Ex. 1 at 54:20–55:1 ("So they get – first they must be qualified and second *they must choose to do it*, based on seniority. If the most senior person doesn't want to do it, he goes to the next person on the list *until someone is interested*." (emphasis added)).) At bottom, Hovey's testimony as to how drivers are selected for out-of-state charter trips—namely, that drivers must be interested in driving interstate and choose to do so—belies any contention that CMD randomly assigned drivers to trips.[4]  *Contra Clark v. Royal Trans. Co.*, Case No. 15-13243, 2017 WL 3891783, at *5–6 (E.D. Mich. Sept. 6, 2017) (finding that the defendants established that they were entitled to the motor carrier exemption where there was "no dispute that Royal retain[ed] discretion to assign drivers *any* route and that all of its drivers were subject to being assigned interstate routes").

The case on which CMD relies, *Resch v. Krapf's Coaches, Inc.*, is distinguishable. In *Resch*, the Third Circuit affirmed the district court's ruling that the FLSA exemption applied because there was no genuine dispute of material fact regarding whether the plaintiffs reasonably could have expected to drive interstate. 785 F.3d at 874–75. In its analysis, the Third Circuit explained that the undisputed evidence showed that the defendant-employer "had a 'company policy' of training its drivers on as many routes as possible, retaining discretion to assign drivers to drive either interstate or intrastate routes—at any time—on which they had been trained, and disciplining any driver who refused." *Id.* at 874. Unlike *Resch*, where the drivers risked

---

[4] At oral argument, defense counsel argued that although CMD gives the subclass of workers who have agreed to drive interstate a choice as whether to drive a given charter trip in order to maintain positive employer-employee relations, at the end of the day, CMD maintains the ability to randomly assign those workers if no one chooses to drive the charter. CMD has not pointed to any record evidence indicating this is the case, and the Court finds that this is a dispute of fact—a reasonable juror could find that CMD maintained the ability to randomly assign drivers to charter trips that no one had voluntarily chosen to undertake, or a reasonable juror could also conclude that CMD would cancel the charter if no driver chose to do the trip.

discipline if they refused to drive out of state, here evidence shows that a driver had to be interested and affirmatively choose to drive out of state.

In sum, because a reasonable juror could find that the decision to drive interstate was entirely voluntary and in the hands of each individual driver, the Court cannot find as a matter of law that Plaintiffs had a reasonable expectation of driving interstate. Therefore, CMD failed to show that the motor carrier exemption to the FLSA applies to it, and the Court denies its motion for summary judgment on this ground.

## IV. Conclusion

For the foregoing reasons, the Court denies CMD's motion for summary judgment.

An appropriate Order follows.